THE NATIONAL WATER WORKS COMPANY OF NEW YORK, Respondent, v. THE SCHOOL DISTRICT OF KANSAS CITY, Appellant.

Kansas City Court of Appeals, November 8, 1886.

1.  PRACTICE—NON-SUIT—EFFECT OF AND AS TO WHETHER AN ESTOPPEL FROM NEW ACTION.—By the common law practice the plaintiff could take a non-suit at any time before the jury returned a verdict. Under the code (section 3556, Revised Statutes) a non-suit is, in effect, a dismissal of the action, and this may be done at any time before the final submission for the verdict of the jury.  A *voluntary* non-suit, taken by the plaintiff any time before the judgment, will not estop him to bring a new action.  Much more so should this rule apply where the non-suit is *enforced* by an adverse conclusive ruling of the court.

2.  THE SCHOOL DISTRICT OF KANSAS CITY—ITS RELATION TO THE CITY

Government—Case Adjudged.—The School District of Kansas City is an independent corporation in every vital particular. The title and control of the school buildings are effectually vested in the board of school directors — the school district corporation. * * * The city government has no voice nor agency in the matter. It has nothing whatever to do with the school buildings or other property of this incorporated district. The city neither builds, owns, nor controls the school houses. It cannot pass a single valid ordinance respecting them. They are, therefore, not "public buildings" of the city.

3. Case in Judgment—Construction of Contract between City of Kansas and the National Water Works Company of New York.—The plaintiff corporation owned and operated the water works of Kansas City under a contract between it and the city, entered into pursuant to authority granted by an act of the general assembly of the state, and as a part of the consideration of granting the franchise to plaintiff to furnish pure water for said city, it was stipulated that plaintiff should, at all times thereafter, supply water free of charge "for all public buildings and offices of said city." *Held*, that as the city did not erect the school buildings, nor control them, and as it did not use or take water therefor, defendant—The School District—is not within the terms of the exemption expressed in the contract.

Appeal from Jackson Circuit Court, Hon. Turner A. Gill, Judge.

*Affirmed.*

Statement of case by the court.

This is an action to recover of the defendant compensation for water furnished it by plaintiff between the first day of July, 1880, and the first day of January, 1881, for the use of certain designated school buildings situate within the corporate limits of the city.

The answer pleaded that the plaintiff corporation owned and operated the water works of Kansas City under a contract between it and the city, entered into pursuant to authority granted by an act of the general assembly of the state, and that as a part of the consideration of granting the franchise to said company to furnish pure water for said city, it was expressly stipulated that the plaintiff should at all times thereafter

supply water free of charge for all public buildings and offices of said city. It is then alleged that the school buildings, to which the water in question was furnished, are public buildings within the terms of this contract and are, therefore, exempt from water rates.

The answer then further pleaded a former recovery between the same parties on the same cause of action. The basis for this plea rests on the admitted fact, that in April, 1881, long prior to the institution of this action, the plaintiff brought suit against the defendant in the United States circuit court for the western division of Missouri, to recover judgment on the same cause of action, wherein the same defence was interposed first above stated. That on a trial had therein, before a jury, at the conclusion of the evidence, the court instructed the jury to the effect that under the pleadings and evidence the plaintiff could not recover. Thereupon the plaintiff took a non-suit, and afterwards, within due time, filed its motion to set aside said non-suit, which motion, after argument and consideration, the court overruled.

On demurrer interposed by defendant the court struck out this last defence.

The cause was submitted for trial to the court sitting as a jury. The section of the contract between the city and the water works company is as follows: "The city may also use and take, and the company is to suppy from the water works, as now constructed and hereafter extended, water for use in all public buildings and offices of the city, and for any fountains the city may erect on the public ground, and for any drinking places the city may choose to erect in any portion of the city, and for basins for watering stock from waste water out of such fountains, * * * said company shall not have any pay or compensation for water the city may so use or take, other than the hydrant rent, to be paid as by this ordinance is provided."

The following facts were agreed upon at the trial:

"1. That both plaintiff and defendant are corporations.

"2. That the plaintiff erected and is now operating in the City of Kansas, with pipes extending beyond the limits of the city, a system of water works, and that it is authorized so to do by ordinances number 10,524 and 14,776 of said city, and said ordinances may be considered as read in evidence and the acceptance of the company.

"3. The public schools were established and have been organized under acts of the legislature, incorporating city in 1853, acts 1861, 1863, 1866, 1867, and following years, *and during that year 1867, under the law as then existing*, a board of education was elected, consisting of W. E. Sheffield, E. H. Allen, J. A. Bachman, A. A. Bainbridge, E. H. Spaulding, and Patrick Shannon, *and the system as then organized* has been continued ever since under the several changes that have taken place in the law during the time.

"4. *Ever since the school district was organized, in 1867*, it has embraced territory outside of the city limits.

"5. The school buildings of defendant at present time are as follows: Washington, Humboldt, Lathrop, Morse, Franklin, Woodland, Central, Benton, Switzer, Chase, Karnes, Martin, Lincoln, and Sumner. And of these, the Martin, having three rooms, and the Woodland, twelve rooms, are situated outside of the city limits, and the date of the erection of these several school houses is as follows:

"Washington, in 1867; Humboldt, in 1868; Central, in 1868; Lathrop, in 1869; Franklin, in 1869; Morse, in 1870; Benton, in 1870; Woodland, in 1871; Lincoln, in 1879; Karnes, in 1880; Switzer, in 1881; Chase, in 1881; Martin, in 1883; Sumner, in 1883.

"6. The following houses now take water from plaintiff, and the dates of commencing are as follows:

"Central, January 1, 1877; Washington, January

1, 1877; Humboldt, November, 1875; Franklin, November, 1875; Lathrop, November, 1875; Benton, November, 1875; Lincoln, July 1, 1878; Woodland, September 27, 1882; Switzer, September 28, 1883; Sumner, November 12, 1883.

"7. The water taken was all paid for by defendant until July 1, 1830, at which time defendant was taking and using water in the Franklin, Lathrop, Humboldt, Central, Washington, Lincoln, and Benton schools, and so continued to take in said houses from July 1, 1880, to January 1, 1881, and if defendant is liable, the amount sued for during said period is correct."

The court found the issues for plaintiff, and entered judgment accordingly. Defendant has appealed.

GAGE, LADD & SMALL, for the appellant.

I. The court erred in sustaining the demurrer to the *second* defence pleaded in the answer. That defence was a valid plea of *res adjudicata*. The decision in that case was a final judgment; it was "the final determination of the rights of the parties in the action." Rev. Stat., sect. 3672; *Collier v. Weldon and wife*, 1 Mo. 1; *Chiles v. Wallace*, 83 Mo. 84; *Moody v. Deutsch*, 20 Cent. L. J. No. 13, p. 33. In such cases as this, there is no non-suit in the proper sense of the word. By taking a voluntary non-suit a plaintiff goes out of court absolutely and finally. But when he says, I take a non-suit with leave to move to set it aside, or accompanies his non-suit with such a motion, he does not, in fact, take a non-suit; he still holds on to the court and the defendant, and litigates further. The effect of this proceeding is merely to waive the formality of an adverse verdict, to admit that the jury will do as the court has already directed, and to submit his case, in the most favorable manner for himself, to the court, as matter of law. Submitting his case in that manner, the decision is no less final or binding than if made upon demurrer or verdict.

II. The court also erred in refusing to declare the

law as asked by defendant. The public school buildings of the city were, in fact, public buildings of the city even though the management and control and the title to the property had been vested by law in a separate board. The management, property and funds belonging to the schools of Kansas City, were originally vested in the municipal corporation. Subsequently, in order to separate them from politics, they were committed to the charge of different officers from those who managed the other affairs of the city. In other words the city was incorporated over again for *school purposes*, and the school property belonging to the city for the purposes of better management was transferred to the new board. This branch of the municipal administration has been continued ever since in this separate organization, but it has always, and is to-day, just as much a part of the city government as the police board. In a proper and just sense Kansas City still has public schools and public school buildings, and it is not to be doubted that in fact it was the intention and meaning of this contract to include the school buildings within the city, in the term "public buildings of the city."

KARNES & ESS, for the respondent.

I. From 1861 to the present time the corporation known as the "City of Kansas," and that known as the "Kansas City School District," have been entirely distinct, and neither having any control over the affairs of the other, or any interference therewith in any way. These school houses were only in part buildings *in* the city, and in no sense whatever could they be said to be buildings *of* the city.

II. The language of the ordinance contract is "public buildings and offices of the city." This could not mean such buildings *in the city*, as this would include all *located in the city*, as the postoffice, custom house, county court house, etc. The city intended to provide

for its *own buildings and offices*, and made no provision for *other public buildings*.

III.  As to so much of the school district as was embraced within the limits of the city, there were two corporations, occupying the same territory, at the same time.  This can be done.  Dillon on Mun. Corp. [3 Ed.] sect. 24.  Though the school district may take the name of the city, there is scarcely any limit to the territory which it may embrace on the outside, and this can be legally done.  *State v. Board Ed. Appleton City*, 53 Mo. 127; *State v. Miller*, 65 Mo. 50; *Henry v. Dulle*, 74 Mo. 443; *State v. Heiser*, 60 Mo. 540.

IV.  The record in this case shows that the plaintiff took a non-suit before the case was submitted to the jury.  As soon as the court announced what the instructions would be the non-suit was taken.  This it had a right to do.  *Hensley v. Peck*, 13 Mo. 587; *Templeton v. Wolf*, 19 Mo. 101; *Lawrence v. Shreve*, 26 Mo. 492; *Benoist v. Murrin*, 48 Mo. 52.  After the non-suit had been taken in the United States court, plaintiff could have commenced a new suit at once in the same court. *Homer v. Brown*, 16 How. [U. S.] 354; *Insurance Co. v. Broughton*, 109 U. S. 121.

V.  To constitute a judgment a bar to a subsequent suit, it must appear to have been a decision on the merits of the case—a judgment of non-suit is not a decision of the merits.  *Taylor v. Larkin*, 12 Mo. 103; *Wells v. Moore*, 49 Mo. 229.

PHILIPS, P. J.—I.  The first question, in the order of its effect, to be considered is the plea in bar.  It is conceded by the learned counsel for appellant that plaintiff had the right, upon the adverse instruction by the court, to take a non-suit, and that had it taken no further action thereon, the judgment of non-suit would have been no bar to this action.  But their contention is that by moving the court to set aside this judgment of non-suit, the plaintiff thereby called in review the ruling

of the court on plaintiff's right to maintain the action, and the overruling of this motion was, in effect, a final adjudication on the merits; that it was a final judgment, from which, under our state practice, an appeal would lie, and if not appealed from, or further prosecuted by writ of error, the judgment was conclusive.

This proposition is enforced with plausible argument, but it is not sustained by any adjudication, and, so far as our observation extends, it is not in accord with the common understanding of the profession and the usage of the courts.

Section 3556, Revised Statutes of Missouri, declares that: "The plaintiff shall be allowed to dismiss his suit or take a non-suit at any time before the same is finally submitted to the jury or to the court sitting as a jury, or to the court, and not afterwards."

Section 914, Revised Statutes of United States, declares that: "The practice, pleadings and forms and modes of proceeding in civil causes, other than equity and admiralty causes, in the circuit and district courts shall conform as near as may be to the practice, pleadings and forms and modes of proceeding existing at the time in like causes in the courts of record of the state in which such circuit or district courts are held, any rule of court to the contrary notwithstanding."

By rule forty-five of the United States circuit court, in which said cause was so tried, it is provided, that: "The plaintiff shall be allowed to dismiss his suit or take a non-suit at any time before the same is finally submitted to the jury, or to the court sitting as a jury, or to the court, and not afterward."

Laying aside any consideration of said rule forty-five, we are justified in assuming that either the common law rule of practice was in vogue in the United States court, or that it so construed the federal statute above quoted as to apply said section 3556, Revised Statutes of Missouri, to its procedure. By the common law practice the plaintiff could take a non-suit at any time before the

jury returned a verdict. Under the code a non-suit is, in effect, a dismissal of the action. This may be done at any time before the final submission for the verdict of the jury. 2 Hayne's New Trial and Ap., sect. 113. Bigelow on Estoppels, page 32, says: "A voluntary non-suit, taken by the plaintiff any time before judgment, of course, will not estop him to bring a new action." Much more so should this rule apply where the non-suit is enforced by an adverse conclusive ruling of the court.

Freeman on Judgments, section 261, says: "A non-suit is but like the blowing out of a candle, which a man at his own pleasure may light again. Under no circumstances will such a judgment be deemed final, whether entered before or at the trial. That such a judgment was entered by the court upon an agreed statement of facts, will not give it any force as an estoppel." *Homer v. Brown*, 16 How. 354; *Derby v. Jacques*, 1 Cliff. 432.

The force of this rule is made apparent when it is recalled that a motion for non suit by a defendant is a waiver of his right to have judgment on the merits, or to litigate new matter set up in his answer, for it is equivalent to a dismissal of the action with defendant's consent. Freeman on Judgments, sect. 261a.

As the non suit was enforced it is not comprehensible, to my mind, how the motion to set it aside, and the action of the court in overruling it, altered the plaintiff's status in respect of its right to re-institute the suit. By its ruling the court, in effect, took the case from the jury before its final submission. As the amount involved was less than the sum essential to entitle plaintiff to an appeal to the United States Supreme Court, the motion for review of the ruling of the court had no such object in view; but was simply in accord with the general practice in such cases, to allow the court an opportunity, on further consideration, to re-consider its ruling, and allow the plaintiff to go to the jury on the merits. The effect of sustaining the motion, had the court seen fit to do so, would not have been to enter

final judgment for the plaintiff, but simply to reinstate the cause for trial; and the parties would have been entitled to a *venire de novo*.

It being an action at law the plaintiff was entitled to a trial by jury; and until the case went to the jury for its verdict there could be no final submission or judgment on the merits. All the trial court could do, if the law of the case was with the defendant, was to direct the verdict of the jury on the facts. Its mere declaration of law was not a final submission, nor was its refusal to allow plaintiff's motion such submission and determination on the merits. Until submission to the jury, the right to take a non-suit was guaranteed to plaintiff, and when taken no action by the court could determine the merits of the case, so as to cut off the privilege of the plaintiff to relight his candle.

We, therefore, hold that the demurrer to this part of the answer was properly sustained.

II. The remaining and graver question is, are the public school buildings, situate within the corporate limits of the City of Kansas, public buildings of the city, within the sense of the contract between the city and the water works company?

It is not questioned by opposing counsel that the language of the contract, "public buildings of the city," implies such buildings as belong to, or are controlled by the city government, and subject to its jurisdiction.

Otherwise it would be extended to any public building which chanced to be situated in Kansas City, and would embrace the county court house and jail, or the United States Custom House and post office, with which the city government has no connection, and to which it is under no obligation to supply water for any purpose.

A brief review of the history of legislation concerning public schools, in their relation to this city, may be valuable in the solution of the question to be answered.

The fostering of popular education has ever been an object sought by both the federal and state governments.   As early as June, 1812, Congress enacted :

"Section 1.   That the rights, titles and claims to town or village lots, out lots, common field lots, and commons, in; adjoining and belonging to the several towns or villages of Portage des Sioux, St. Charles, St. Louis, St. Ferdinand, Village a Robert, Carondelet, Ste. Genevieve, New Madrid, New Bourbon, Little Prairie, and Arkansas, in the territory of Missouri, which lots have been inhabited, cultivated or possessed prior to December 20, 1803, shall be and the same are hereby confirmed to the inhabitants of the respective towns or villages aforesaid, according to their respective rights, etc.

"Section 2.   That all town or village lots, out lots or common field lots included in such survey, which are not rightly owned or claimed by any private individual, or held as commons belonging to such towns or villages, or that the president of the United States may not think proper to reserve for military purposes, shall be and the same are hereby reserved for the support of schools in the respective towns or villages aforesaid," etc.   See sec. 1, vol. 2, p. 748, U. S. Stat.

This legislation, in addition to the purpose to subserve the cause of education, was prompted by a sense of equity to secure to the designated communities the benefit of certain commons appurtenant to the towns and villages at the time of the acquisition by the government of the Louisiana territory.   It was proper enough that the state legislature, in granting charters of incorporation to the designated towns and villages should recognize the object and spirit of the federal enactments so as to secure to the local community the benefit of the reservation.   This was the case, as will be observed by a reference to the acts of the legislature respecting the city of St. Louis.   But, from that dearth of invention and disregard of appropriateness which not infrequently

characterizes the formulating of such acts, we find that in some charters granted by the legislature, like that of the city of St. Joseph, it was enacted as follows :

"Section 1. All powers heretofore granted to the trustees of the town of St. Joseph over and relating to the commons thereto attached and belonging, are hereby vested and continued in the mayor and councilmen of the city of St. Joseph, created by this act ; and the said mayor and councilmen shall have power to manage, lease and sell any or all of said commons in fee-simple on such terms and conditions as they may provide by ordinance, and invest or use the proceeds thereof for the benefit of such city."

"Section 2. The mayor and councilmen shall have power to sell in fee-simple, lease, regulate or otherwise dispose of all lots of ground and all money or property to which the inhabitants may be entitled for the benefit of schools ; and may take all necessary steps to maintain suits to recover the same, or effect compromise with conflicting claimants ; and to appropriate such money or property in such manner as they may consider advantageous to the support of the schools."

Subsequently, in 1853 (Laws Mo. 1853, p. 244), the legislature in incorporating Kansas City, adopted the second section of the act pertaining to the city of St. Joseph. As Kansas City was not in existence at the time of the congressional act in question, in 1812, and as there was not appurtenant to it any such property designated by the act of congress, the said provision inserted in its charter was purely imitative, and possesses little importance in the solution of this controversy. Said section two, of the act incorporating the city of St. Joseph, can hardly be regarded as conferring absolute control over the public schools and buildings on the city government.

In the Revised Statutes of 1855, article eight, ch. 143, the legislature sought to put into practical operation the school system in towns and villages coming within the

purview of the act of congress. The first section declared that the lands and lots so granted by the United States to the inhabitants of the enumerated towns and villages should remain a continual fund to be inviolably appropriated to the support of common schools in said towns and villages.

The second section provided that : "The inhabitants of any such town or village, not heretofore incorporated for school purposes, may be incorporated for such purpose in the manner hereinafter provided."

The third section authorized the county court, on the petition of a given number of inhabitants to incorporate it for school purposes.

Assuming to act under this enabling statute, although it had no application to Kansas City, the county court of Jackson county subsequently made an order designating "The Kansas City School Incorporation."

In 1861 (Laws of Mo. 1861, p. 762), the legislature declared that this corporation should be known as the "Kansas City Board of Public Schools," with perpetual succession, etc.

Without either affirming or denying that this act made the school board an integral part of the municipal corporation of Kansas City, one thing is clearly manifest, both from the general statute of 1855, and the special act of 1861, and that is, it was the purpose and policy of the legislature towards schools thus erected in towns and villages, to so far divorce them from the municipal body as to give over their control and management to a separate board of directors, duly incorporated as a body politic.

Thus stood the law, so far as it affects this inquiry, until 1865, when, by chapter 47, General Statutes, 1865, it was provided, that any incorporated city, town, or village, not then governed as to schools by any special law, might be organized, for school purposes, into and established as a single school district, in the manner thereinafter specified. This statute declared that the directors

should be a body corporate, by the name of the "Board of Education."

In 1867 (Laws Mo. 1867, p. 160), the legislature revised and enlarged the provisions of the school law, concerning schools in cities, towns and villages. It is inferable from the agreed statement of facts that this school district accepted and organized under the act of 1867. The school buildings in question were erected thereafter.

There have since been additional enactments embodying and preserving the substantial provisions of the act of 1867, among which is one changing the corporate name of the body to "The School District of" the given city, town or village. This school district now bears the latter corporate name, which is additional proof that it organized under the general school law.

By section six, of the act of 1867, the directors of such school district are constituted a body corporate, by the given name, "and as such and by such name shall receive all moneys and other property belonging or accruing to said district or to said city, or town or village, or to any part of the same, for the use and benefit of the public schools therein ; and the said board shall be capable of contracting and being contracted with, suing and being sued, pleading and being impleaded in any court, etc.; and shall also be capable of receiving any gift, grant, bequest or devise, for the use of the public schools of said city, etc.; and all moneys accruing to said district for school purposes shall be paid over to the treasurer of said board upon the order thereof."

Section seven provides that "said board shall make rules and regulations for the government of its own proceedings, and shall have charge and control of the public schools and the property appropriated to the use of the same within said district ; shall have power by order or resolution,   *   *   *   to levy and collect taxes upon all property within said district for the erection and maintenance of school buildings, and carrying and conduct-

ing of schools therein ;  *  *  *  and to make and enforce all needful rules and regulations for the government and management and control of such schools and property as they may think proper."

Section eleven confers authority on this board to sell any school house and the lot belonging thereto, when they deem proper, and to reinvest the same in another lot or building.

By this act, I am of opinion, the divorcement of the school district of Kansas City from the municipal government is complete.

It is an independent corporation in every vital particular. The title and control of the school buildings are effectually vested in the board of school directors, the school district corporation. The school board determines all questions as to the raising of money for revenue. The county officers are the agents by which the revenue is collected. The city government has no voice nor agency in the matter. It has nothing whatever to do with the school buildings or other property of this incorporated district. It has nothing to do with furnishing or equipping such buildings. It does not supply them with fuel or water. It has no power or authority to say whether the public schools shall use Kaw, Missouri river or cistern water.

This belongs exclusively to the school board, the district corporation. The city neither builds, owns nor controls the school houses. It cannot pass a single valid ordinance respecting them. To say, therefore, that such buildings are of the city is to mock the legislature and the statute.

It is further worthy of observation, that in 1867 (Laws Mo., 1867, p. 165-6), the legislature authorized the extension of city, town and village school districts so as to embrace territory beyond the limits of the municipal corporation. And the agreed statement of facts shows that ever since the act of 1867, the school district

has embraced territory outside of the city limits. This affords additional evidence, to my mind, of the purpose of the legislature to make the school district a distinct and separate legal entity from the municipal organization.

It is true, as suggested by the learned counsel for appellant, that it is not uncommon for laws to recognize the right of municipal corporations to exert their powers beyond their territorial limits. But this will be found, usually, to be in the exercise of the police power, as a means of repelling disorder from within by suppressing it from without, when so near as to render this precaution wise. Sometimes, also, as a means of internal welfare and development, municipal corporations, by special enabling acts, may extend improvements or lend aid thereto, beyond their corporate limits.

But in all this the municipal body acts for and through itself, through its own legislative body and ministerial officers, and is directly responsible for the abuse of the exercise of this agency.

So, too, it may be conceded, that in the operation of the machinery of municipal governments it occurs, for purposes of greater efficiency, that there is something akin to the distribution of powers, or sub-letting their exercise ; such as the organization of fire companies, sanitary boards and police commissioners in cities. Yet these are but parts and agencies of the general municipal government, with responsibility for their acts, and the power of legislation respecting them reserved in the municipal body. The municipality provides and furnishes them quarters and compensation. Not so in respect of this school district. As already stated, it is an independent body corporate. No suit is maintainable against the city for its contracts or acts. It has no jurisdiction over the school or its property. It makes no provision for housing, equipping or maintaining the school. It can make no prescription as to the character of public building to be used by the district. It contributes nothing towards their erection. It can maintain

no action of ejectment for the recovery of their posses-sion against any intruder. It can maintain no action for trespass upon such property.

Because of the peculiar needs and surroundings of mural society, the legislature makes special laws appli-cable to such localities distinguishable from rural dis-tricts. This is all. Having no jurisdiction over, nor ownership of, nor responsibility for the school buildings, it would, it seems to me, be violative of well recognized rules of construction to hold that such buildings were reasonably within the contemplation of the parties to the contract in question.

The other specifications of the contract, by the rule : *noscitur a sociis*, are confirmatory of the position that it was in the mind of the parties to exempt the city only where, but for the exception the burden of sup-plying water would fall upon the city : "For any fountain *the city may erect*, and for any drinking place *the city* may choose to *erect*, and for basins for watering stock * * *; such company shall not have any pay or compensation for water *the city may so use or take*."

As the city did not erect the school buildings, nor control them, and as it did not use or take water therefor, the conclusion is irresistible that the defendant is not within the terms of the exemption expressed in the contract.

It follows that the judgment of the circuit court should be affirmed. The other judges concurring, it is so ordered.